Charlotte PRESLEY and Larry Presley, Plaintiffs,

v.

BLUE CROSS–BLUE SHIELD OF ALABAMA, Defendant.

No. CV–88–N–5353–NE.

United States District Court,
N.D. Alabama,
Northeastern Division.

July 31, 1990.

Gary W. Lackey, Scottsboro, Ala., Thomas W. Bowron, II, Polson Jones Bowron & Robbins, Birmingham, Ala., for plaintiffs.

Lawrence B. Clark, Sally S. Reilly, Timothy A. Palmer, Birmingham, Ala., for defendant.

## MEMORANDUM OF OPINION

EDWIN L. NELSON, District Judge.

This is a civil action for the recovery of hospital and medical benefits alleged to be due under the terms of an "employee wel-

fare benefit plan" and "welfare plan" under ERISA, 29 U.S.C. § 1001, *et seq.*[1] The action was submitted for decision on stipulated facts.

## I. FINDINGS OF FACTS.

1. On October 26, 1987, plaintiff, Charlotte Presley, went to work as a full-time active employee for the Benham Corporation ("Benham") in Scottsboro Alabama.

2. Prior to Mrs. Presley's employment, Benham established and maintained an employee welfare benefit plan whereby those employees who were participants in the plan could receive health and medical benefits. Blue Cross and Blue Shield of Alabama ("Blue Cross") was Claims Administrator of this plan and, as such, was a fiduciary of the plan. A true and correct copy of the plan is attached hereto as Exhibit A.[2]

3. Employee participation in Benham's health plan was reflected by an invoice method whereby Blue Cross forwarded to Benham a monthly listing of those employees eligible to participate in the plan. Upon receiving this invoice, Benham corrected the list of employees to accurately reflect the plan's current participants and returned the invoice to Blue Cross with payment for participating employees.

4. Enrollment and participation in Benham's health plan was monitored by Benham and communicated to Blue Cross by means of the monthly invoice. Benham added employees to the invoice by either writing an employee's name at the end of the invoice or forwarding an employee's application card to Blue Cross with the monthly invoice.

5. Benham was responsible for communicating an employee's status to Blue Cross. Employee status was communicated to Blue Cross by means of specific codes appearing on the invoice. Code "1" indicated the employee had left employment and was to be removed from the invoice. Code "2" indicated that an employee had been temporarily laid off and that no payment was included for that employee's coverage that month, but the employee was to remain on the invoice with appropriate arrears to be billed at a later date. Code "3" indicated that the employee had requested termination from the plan. Code "4" indicated that the employee was deceased.

6. Under the terms of Benham's health plan, an employee was not eligible to participate in the plan until 90 days after the employee's date of employment. The plan further provides that "before there will be any coverage for an employee or his dependents, his application must be completed, submitted and accepted, and his coverage must begin in accordance with the provisions of this section [Section II]." (Plan, Section II, p. 7.)

7. As a full-time employee of Benham, Mrs. Presley was eligible to participate in Benham's health plan beginning January 26, 1988 (90 days after her date of employment).

8. At the time of her hiring on October 26, 1987, Mrs. Presley filled out an application card for coverage under Benham's health plan for herself and her family members. Benham subsequently forwarded this application card to Blue Cross where it was received on January 25, 1988. The application was properly executed and filed, and Blue Cross accepted Mrs. Presley's application.

9. On January 27, 1988, Larry Presley suffered a heart attack and was admitted to Jackson County Hospital for three days for treatment of this condition.

10. On January 28, 1988, admitting personnel at Jackson County Hospital telephoned Blue Cross to confirm coverage under the plan. Blue Cross verified that Mr. Presley was eligible for coverage under the

---

1. Any plan "established or ... maintained" to provide "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment" to employees of a sponsoring employer is an "employee welfare benefit plan" and "welfare plan" under ERISA, 29 U.S.C. § 1002(1).

2. These findings are reproduced verbatim from the stipulations of the parties and refer to certain attached exhibits. Those exhibits are on file but have not been attached to this opinion.

plan as a family member, effective January 26, 1988.

11. On January 28, 1988, Blue Cross mailed an identification card to Mrs. Presley with an effective date of January 26, 1988.

12. Issuance of an identification card indicates that Blue Cross had accepted Mrs. Presley's application. Under Section II of the Plan, after an application is accepted, coverage commences only "if the requisite fees for coverage of a member have been paid in advance in accordance with Section VII" of the Plan.

13. The requisite fee for coverage of Mrs. Presley and her family for the period January 26, 1988 through February 20, 1988 was $133.79. The employee's monthly contribution was $74.64.

14. Benham withheld $17.23, a weekly employee contribution, from Mrs. Presley's paycheck for medical insurance premiums for the week ending January 30, 1988. This amount was the only deduction ever withheld from Mrs. Presley's paycheck for medical premiums, and Benham did not forward any portion of this amount to Blue Cross for payment of Mrs. Presley's coverage.

15. On February 1, 1988, all employees of Benham were laid off for an indefinite period of time, and Benham subsequently became delinquent in its premium payments to Blue Cross beginning with payments for January 15, 1988. Blue Cross notified Benham of the delinquency. Mrs. Betty Dudley, personnel manager for Benham, contacted Blue Cross and was informed of Blue Cross' practice whereby Benham could code a laid-off employee a "2" for a period of two months and be billed in arrears for this coverage. If during the third month payment was made in full, then coverage could be maintained; otherwise the employee was to be coded a "1," and coverage would be canceled effective the date of last payment.

16. Mrs. Dudley understood it was Benham's responsibility to notify its employees of this practice and not the responsibility of Blue Cross. Mrs. Dudley attempted to contact Mrs. Presley by telephone on three or four occasions to inform her of the arrangement for premium payment with Blue Cross. However, Mrs. Dudley did not contact Mrs. Presley during these attempts. In March 1988, Mrs. Dudley obtained a check from Benham reimbursing Mrs. Presley for the $17.23 payroll deduction made during the week ending January 30, 1988. Mrs. Dudley also intended to inform Mrs. Presley of this reimbursement check when she attempted to contact Mrs. Presley about the premium payment arrangement.

17. Attached hereto as Exhibit B is the invoice for Benham's health plan dated January 15, 1988. This is the first invoice on which Charlotte Presley is listed because she was not eligible to participate in the plan until January 26, 1988. Benham coded Charlotte Presley a "2" on this invoice and did not remit any payment for her coverage.

18. Attached as Exhibit C is the invoice for Benham's health plan dated February 15, 1988. Benham coded Charlotte Presley a "2" on this invoice and did not remit any payment for her coverage.

19. Attached as Exhibit D is the invoice for Benham's health plan dated March 15, 1988. Benham crossed Charlotte Presley's name from this invoice, coded her a "1," and did not remit any payment for her coverage. At no time did Blue Cross ever receive any payment whatsoever from Benham or any other party for coverage of Charlotte Presley under Benham's health plan.

20. Between the dates of January 15 and May 30, 1988, Benham collected full premium payments from certain employees and submitted them to Blue Cross in one check as a group premium. Those individuals were provided uninterrupted coverage. Blue Cross does not concede that it ever understood or agreed that individuals could pay individual premiums without contribution by Benham.

21. Blue Cross never made any effort, whether orally or in writing, to give Mrs. Presley or any other group member personal notice of the following:

a. Her employer was delinquent in premium contributions.

b. She could pay the total premium herself to Benham's personnel manager to be forwarded to Blue Cross and obtain coverage subject to the limitations of the plan under Benham's health plan.

c. Her coverage was never in effect under Benham's health plan with Blue Cross.

d. Her right, if any, to convert to an individual policy or any other rights, if any, she was entitled to under CO-BRA.

e. Payments of past due premiums would provide retroactive coverage subject to the limitations of the plan beginning January 26, 1988.

In stipulating it did not give plaintiffs personal notice of the foregoing items, Blue Cross does not stipulate or concede it was under any duty to give such notice.

22. Under the terms of Benham's health plan, Benham acted as Remitting Agent for the employees, and not Blue Cross, to collect and remit the fees payable under the Plan and for receipt from Blue Cross of all identification cards, certificates or summaries of coverage, changes in the contract or employees' coverage, and notices under the contract. (Plan, Section I, 26., p. 4–5.)

23. The total hospital bills for treatment of Larry Presley's heart attack were as follows:

| | | |
|---|---|---|
| a. | Jackson Hospital: | $3,614.91. |
| b. | S. Taprice, M.D.: | $  403.00. |
| c. | Thomas Gibson, M.D.: | $   41.00. |
| d. | V. Reddy, M.D.: | $   24.00. |
| | TOTAL: | $4,082.91. |

24. These bills were submitted to Blue Cross for payment.

25. On May 5, 1988, Blue Cross paid $22 to William Coleman, M.D. for services rendered to B.C. Presley on February 15, 1988. Mrs. Presley subsequently received a copy of the claim report of this payment.

26. All other claims at issue in this case were denied by Blue Cross. Charlotte Presley received a claims report dated May 12, 1988, which notified her that these claims had been denied because "this service was provided after the patient's contract coverage was discontinued." Mrs. Presley was asked to "[p]lease contact your personnel office or our customer service center if you have any questions concerning eligibility for coverage."

27. Attached as Exhibit E is a true and correct copy of the Summary Plan description of Benham's health plan. This document was delivered to Mrs. Presley by Benham in January 1988.

28. Attached as Exhibit F is a true and correct copy of the membership card issued to Mrs. Presley.

29. Attached as Exhibit G is a true and correct copy of the payroll deduction of Mrs. Presley's pay for the week ending January 30, 1988, which indicates that Benham withheld $17.23 for Mrs. Presley's insurance premium.

30. Attached as Exhibit H is a true and correct copy of the Blue Cross claims reports at issue in this case.

## II. THE CLAIMS.

The plaintiffs claim they were members or beneficiaries of the Benham Medical Plan, and that the hospital expenses incurred due to Larry Presley's heart attack were covered expenses under the plan. They assert Blue Cross arbitrarily and capriciously denied payment of the hospital expenses.

Plaintiffs also aver Blue Cross breached its fiduciary duties to the plan under 29 U.S.C. § 1104 by failing to notify beneficiaries of Benham's failure to pay premiums. Plaintiffs also assert this failure was a violation of Alabama law regulating the "business of insurance" saved from the ERISA exemption by 29 U.S.C. § 1144(b)(2)(A).

Finally, plaintiffs claim Blue Cross's failure to give them notice was a breach of Blue Cross's duty under 29 U.S.C. § 1166.

Plaintiffs request that the court clarify their rights to future benefits under the plan pursuant to 29 U.S.C. § 1132(c), award the benefits due them under the plan,

award attorney's fees under 29 U.S.C. § 1132(g), and allow equitable relief necessary to enforce the plan provisions.

## III. THE DEFENDANT'S INTERPRETATION OF THE PLAN LANGUAGE.

Judicial review of an ERISA benefits denial decision is de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Brown v. Blue Cross & Blue Shield, Inc.,* 898 F.2d 1556 (11th Cir.1990). Where the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, review is limited to determining whether the decision of such administrator is arbitrary and capricious. *See Jett v. Blue Cross and Blue Shield, Inc.,* 890 F.2d 1137 (11th Cir.1989). The Benham plan provides:

> As a condition precedent to coverage, it is agreed that whenever the Company makes reasonable determinations which are not arbitrary and capricious in the administration of the Contract (including, without limitation, determinations whether services, care, treatment, or supplies are Medically Necessary, whether surgery is Cosmetic Surgery, or whether charges are reasonable), such determinations shall be final and conclusive.

*See the Benham Plan,* Exhibit A to the parties' "Stipulation of Facts", at p. 45. Given this express grant of discretionary authority to Blue Cross, the court's review of the defendant's denial of coverage is limited to determining whether it acted arbitrarily or capriciously. *Firestone, supra; Brown, supra; Jett, supra.*

In *Brown,* the United States Court of Appeals for the Eleventh Circuit considered the appropriate application of the arbitrary and capricious standard of review

when there is a possible conflict of interest because an insurance company serves as the decision-making fiduciary for benefits that are paid out of the insurance company's assets. In such cases, a "wrong but apparently reasonable interpretation" will be found to be arbitrary and capricious if it advances the interest of the fiduciary at the expense of the beneficiary, unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries. *Id.* at 1566–67. At issue here is a plan for which Blue Cross acted as the decision maker with regard to benefits to be paid from its own assets and its conduct must be evaluated under the heightened scrutiny mandated by *Brown.*

The first step in the application of the arbitrary and capricious standard requires the court to determine whether the defendant's interpretation of the disputed plan provision was correct. *Brown,* 898 F.2d at 1566, n. 12. If that interpretation was wrong, the court must go forward and determine if Blue Cross acted arbitrarily and capriciously in adopting an incorrect view of the plan language, taking into account its possible self-interest. *Id.* at p. 1570. Even a reasonable, but incorrect, interpretation will be found to be arbitrary and capricious if it was made by a fiduciary with a conflict of interest and advances the interests of the fiduciary at the expense of the beneficiary unless the fiduciary can justify its interpretation. *Id.* at 1566–67. It follows then that it is only where a fiduciary acting under a possible conflict of interest incorrectly interprets the plan language that the court must go further under *Brown.*[3]

The court in *Brown* said of the first step, "[W]e must determine if [the plaintiff] has proposed a sound interpretation of the plan, one that can rival the fiduciary's interpretation. Thereafter we evaluate whether the fiduciary was arbitrary and capricious in adopting a different interpretation." *Brown* at 1570. The contract lan-

---

**3.** The court said in *Brown,* "It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary." 898 F.2d at 1566, n. 12.

guage in question here provides in pertinent part,

3. *Acceptance of Coverage*

No Employee or Dependent for whom coverage is applied shall be covered under this Contract unless the application for coverage of that Employee or Dependent has been accepted by the Company and such acceptance has been evidenced by the Company's issuance of an identification card or by other written notice of acceptance to the Employee. The payment of fees to the Company for any Employee or Dependent for whom coverage is applied shall not effectuate coverage for such Employee or Dependent unless and until the Company's identification card or other written acceptance for the Employee or Dependent has been issued; and in the absence of issuance by the Company of its identification card or other written acceptance for such Employee or Dependent, the Company's liability shall be limited to refund of the amount of fees paid.

4. *Commencement of Coverage*

When an application is accepted in the above manner, and *if the required fees for coverage of a Member have been paid in advance* in accordance with Section VII, the Company's coverage of the Member shall commence on the following applicable Effective Dates

. . .

Group Hospital and Major Medical Contract for Benham Corporation, Section II, subsections 3 and 4, Exhibit A. (emphasis supplied.) Blue Cross asserts that since it never received any payment for coverage

of Charlotte Presley or her dependent under Benham's health plan, her coverage never commenced. The plaintiffs have not suggested "a sound interpretation of the plan" in lieu of that made by the defendant and the relevant provisions are neither ambiguous nor misleading.

The court, "from the perspective of de novo review," agrees that Blue Cross correctly interpreted the plan provision, and the Presleys never became covered under the plan. Since the defendant's interpretation of the plan provision was not "wrong," it necessarily follows that it was not arbitrary and capricious.[4] Since the denial of coverage under the plan was appropriate, the court need not consider any alleged self-interest of the fiduciary. *Brown,* 898 F.2d at 1566, n. 12.

## IV. THE NOTICE REQUIREMENTS.

### 1. FIDUCIARY DUTY.

A finding that Blue Cross correctly interpreted the coverage provision of the plan does not dispose of its alleged duty to give certain notices to plan participants. The coverage provision addresses only the question of when "coverage" under the plan begins. "Coverage" is not defined in the contract, but it specifies three kinds of "coverage:" "basic coverage,"[5] "major medical coverage," and "substance abuse rehabilitation coverage." The provision does not address the question of the duty owed by Blue Cross to those who were "eligible" for coverage, had "applied" for coverage, and were "accepted" for coverage, but for whom coverage had not begun.

---

**4.** A summary plan description required by 29 U.S.C. § 1022(a)(1), § 1024(b)(1), was provided to Charlotte Presley. Its provisions are not as clear regarding the requirement that the required fees for coverage must be paid in advance, and in fact, the summary plan description makes no mention of that requirement at all. Furthermore, the summary plan booklet does not define "remitting agent" or explain to the members of the plan that their employer is their agent and not the agent of Blue Cross. The Eleventh Circuit has rejected Blue Cross's argument that the plan must control over the summary plan description due to language in the summary plan description referring participants to the full contract plan. *Brown v. Blue Cross & Blue Shield, Inc.,* 898 F.2d 1556, 1570

(11th Cir.1990), *citing McKnight v. Southern Life & Health Insurance Co.,* 758 F.2d 1566, 1570 (11th Cir.1985). Nevertheless, plaintiffs have not claimed that they relied on the provisions of the summary plan booklet. *McKnight* requires that the plaintiffs prove detrimental reliance on the faulty ERISA plan document as a prerequisite to recovery. *McKnight,* 758 F.2d at 1570–71.

**5.** Including inpatient hospital service benefits, outpatient hospital service benefits, physician services benefits, ambulatory surgical facility service benefits, and supplemental accident benefits.

Neither does any other provision of the plan illuminate any duties owed by Blue Cross to persons in the plaintiffs' circumstances.

■ The plaintiffs argue that Blue Cross breached its duty as an ERISA fiduciary when it failed to notify them of Benham's "delinquency" in making its premium payments. An ERISA fiduciary must "discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries ..." 29 U.S.C. § 1104. "The term 'participant' means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7). Blue Cross has acknowledged that Charlotte Presley was an employee who was "eligible" for benefits under the Benham plan. She was, therefore, a "participant" in the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at ——, 109 S.Ct. at 957–58, 103 L.Ed.2d at 97 (1989). Accordingly, Blue Cross, as fiduciary to the Benham plan, owed fiduciary duties to Charlotte Presley, a participant of that plan.

■ Although fiduciary obligations may not be waived, they may be delegated by express provision in the plan instrument. *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 568, 105 S.Ct. 2833, 2839, 86 L.Ed.2d 447, 456 (1985), *reh. den.*, 473 U.S. 926, 106 S.Ct. 17, 87 L.Ed.2d 696 (1985), 29 U.S.C. § 1105(c); *See Anderson v. Ciba–Geigy Corp.*, 759 F.2d 1518, 1522 (11th Cir.1985), *reh. den.*, 767 F.2d 938 (1985), *cert. denied*, 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985). Upon delegation of fiduciary duties, the fiduciary is not thereafter liable for the acts or omissions of the person carrying out the fiduci-

ary responsibility, except to the extent it participates knowingly in the breach, or fails to act reasonably in discharging its own responsibilities and thereby enables the other fiduciary to commit the breach, or it has knowledge of a breach by such other fiduciary and makes no reasonable efforts under the circumstances to remedy the breach. 29 U.S.C. § 1105(c), § 1105(a). Blue Cross's delegation of the fiduciary duty to provide notice to plan participants was proper pursuant to § 1105(c), and Blue Cross is not liable for Benham's failure to notify participants in absence of one of the factors set out at § 1105(a).[6] There is no evidence Blue Cross participated knowingly in the failure of Benham to notify the plaintiffs. Neither is there evidence Blue Cross knew Benham had failed to notify the plaintiffs. Neither is there evidence Blue Cross knew Benham had failed to notify the plaintiffs. 29 U.S.C. § 1105(a)(1) and (3). Plaintiffs have complained only that Blue Cross notified Benham of the delinquency and did not give notice directly to the employees. They have not alleged Blue Cross failed to discharge its responsibilities in notifying Benham. 29 U.S.C. § 1105(a)(2). Since Benham had the delegated duty to notify its employees under the plan, and Blue Cross in no way failed to discharge its duty to notify Benham, there was no breach of fiduciary duty on the part of Blue Cross.

2. DUTY TO PROVIDE NOTICE PURSUANT TO 29 U.S.C. § 1166(a)(4) (COBRA).

■ Section 1166(a)(4) requires the "administrator" of a plan to notify any "qualified beneficiary" of a qualifying event, such as a reduction of hours of the "covered employee's" employment. *Id.*, 29 U.S.C. § 1163. A "qualified beneficiary" includes a "covered employee" in the case of a termination or reduced employment. 29 U.S.C. § 1167(3)(B). "The term 'covered

---

**6.** Blue Cross argues that it sufficiently discharged any fiduciary duty to notify plaintiffs of Benham's failure to make insurance payments, of their opportunity to gain retroactive coverage by payment of past due premiums, and of the

fact that coverage of Ms. Presley was never in effect under Benham's health plan by providing notice to Benham. Blue Cross asserts Benham was obliged to notify plan participants under the plan. (Plan, p. 42).

employee' means an individual who is (or was) provided coverage under a group health plan by virtue of the performance of services by the individual for 1 or more persons maintaining the plan." 29 U.S.C. § 1167(2). Since Charlotte Presley never had coverage under the plan, she was never a "covered employee," and she was not entitled to continuation coverage pursuant to § 1161(a), or to notice pursuant to § 1166(a)(4). Moreover, an "administrator" is a person so designated in the plan instrument, or the plan sponsor, or the designee of the Secretary of Labor. 29 U.S.C. § 1002(16). Therefore, if Charlotte Presley were a covered employee, the notification of rights pursuant to § 1166(a)(4) would be the duty of Benham Corporation, as the designated "administrator," or as the "plan sponsor." *See* 29 U.S.C. § 1002(16)(B). Plan, Section XIII, D.

### 3. DUTY TO PROVIDE NOTICE PURSUANT TO ALABAMA LAW.

██ Finally, the plaintiffs urge that Blue Cross should have provided them direct notice of Benham's failure to make timely payments pursuant to *Newton v. United Chambers Insured Plans*, 485 So.2d 1147 (Ala.1986).[7] In *Newton*, the Alabama Supreme Court, answering questions certified by the United States District Court for the Southern District of Alabama, held that the insurer of a group employment health plan was required, under Alabama law, to notify a plan participant of the cancellation or modification of the insurance policy occasioned by failure of the employer to pay insurance premiums. *Id.*, 485 So.2d at 1150. The court noted that, upon the insurer's breach of the duty to notify, the plan participant was entitled to the "rights ... [which] would have been available under the policy had the employee received notice." *Id.* As discussed above, plaintiffs were participants in the Benham plan. Although the *Newton* premiums were paid in full by the employer, the rule is equally applicable when the employee pays part of

the premium. *Harrison v. Insurance Company of North America*, 294 Ala. 387, 318 So.2d 253 (1975); *Shears v. All States Life Ins. Co.*, 242 Ala. 249, 5 So.2d 808 (1942). In light of *Harrison*, the court cannot conclude that "constructive notice" due to the employer's failure to withhold the employee's portion is sufficient to satisfy *Newton*.

██ Central to the efficacy of any state law which "relates" to any ERISA plan is consideration of the effect of the preemptive provisions of ERISA. If a state law "relates" to an employee benefit plan it is preempted by ERISA's "preemption clause." 29 U.S.C. § 1144(a) which provides,

> Except as provided in subsection (b) of this section [the saving clause], the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan....

The so-called "saving clause" excepts from exemption, all state laws which regulate "insurance, banking, or securities." Section 1144(b)(2)(A) provides

> Except as provided in subparagraph (B) [the deemer clause], nothing in this title shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

Finally, the Congress limited the power of the states to "deem" ERISA plans to be insurance companies. Section 1144(b)(2)(B) provides,

> Neither an employee benefit plan ... nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, or investment companies ...

**7.** The court may exercise pendant jurisdiction over this state claim pursuant to the authority of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). That is, there

is a substantial federal claim, and a state claim arising from the same common nucleus of operative fact.

The Congress made the preemption provisions of ERISA deliberately expansive, designed to "establish pension plan regulation as exclusively a federal concern." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39, 46 (1987).

Following the legislative scheme, the *Newton* rule is preempted by ERISA if it "relates" to an ERISA plan unless it is a law which purports to regulate insurance companies and does not fall within the proscriptions of the "deemer" clause. The Supreme Court has instructed the lower courts to interpret the phrase "relate to" under its broad common sense meaning so that a state law "relates to an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490, 501 (1983). Controlling decisional law in this circuit holds that preemption is not limited to laws "dealing with the particular subject matters covered by ERISA, such as reporting, disclosure and fiduciary responsibility." *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1469 (11th Cir.1986), *cert. den.*, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987). The Eleventh Circuit has said that ERISA preempts state laws even if the "laws do not expressly concern employee benefit plans" but rather "amount only to indirect regulation of such plans." *Howard v. Parisian, Inc.*, 807 F.2d 1560, 1563 (11th Cir. 1987); *Clark v. Coats and Clark, Inc.* 865 F.2d 1237, 1243–44 (11th Cir.1989). Given this expansive view of the "relates to" language it is clear that the *Newton* decision is one subject to the preemptive effect of 29 U.S.C. § 1144(a) unless it can be said that it is one which regulates the "business of insurance."

The courts have developed a two-step test to determine whether a state law falls within the saving provision of 29 U.S.C. § 1144(b)(2)(A). *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. at 48, 107 S.Ct. at 1553, 95 L.Ed.2d at 48–49; *Anschultz v. Connecticut General Life Insurance Co.*, 850 F.2d 1467, 1468 (11th Cir.1988). First, the law must "regulate" insurance, the common-

sense view of that phrase being that the law must not just have an impact on the insurance industry, but must be specifically directed toward that industry. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. at 48, 107 S.Ct. at 1553, 95 L.Ed.2d at 48; *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 740, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985). Second, the law must regulate the "business of insurance," as that phrase has been interpreted in case law under the McCarran–Ferguson Act, 59 Stat. 33, 15 U.S.C. § 1011, *et seq.* Three factors have been used to determine whether a practice falls under the "business of insurance" for purposes of the McCarran–Ferguson Act: (1) whether the practice has the effect of spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. at 48–49, 107 S.Ct. at 1553, 95 L.Ed.2d at 48; *Anschultz v. Connecticut General Life Insurance Co.*, 850 F.2d at 1468. Moreover, the court is guided by an understanding that the civil enforcement remedies of ERISA were intended by the Congress to be exclusive. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. at 54, 107 S.Ct. at 1556, 95 L.Ed.2d at 52.

Alabama's *Newton* rule clearly is specifically directed toward the insurance industry. The rule places a duty upon insurers to notify their insureds of any event which will cause a cancellation or modification adverse to the interests of such insureds. The McCarran–Ferguson Act factors are less clearly resolved in favor of a finding that the rule is one regulating the business of insurance. The rule seemingly has the effect of spreading a policyholder's risk inasmuch as it affords him the opportunity to maintain in effect an insurance contract which will allow him to spread the risk insured against to the insurance industry. The existence or non-existence of a contract of insurance is the essence of the "transfer of risk" criteria. This Alabama rule has nothing to do with determining the extent of the risk transferred, but only

whether the risk had been transferred. Therefore, it meets the first part of the McCarran–Ferguson test. *See Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 130, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647, 656–57 (1982) (discussing the three factors in the context of the McCarran–Ferguson Act).

Whether the *Newton* rule can be said to represent an integral part of the relationship between the insured and the insurer is tenuous at best. In employee health insurance plans of the type considered in *Newton* and of the type covered by ERISA it is ordinarily the employer, or plan sponsor, who has a direct relationship with the insurance company. *Newton* does nothing more than to advise the plan participant of the need to act because of the delinquency of his employer. That might entail the establishment of a direct relationship between the insurance company and the plan participant but does not, in the opinion of the court, involve an integral part of the relationship then existing. In other words, compliance with *Newton* may create a direct relationship between the insurer and the insured. But, there being no such direct relationship prior to the employer's default, the rule cannot represent an integral part of a non-existent relationship.

The third part of the test is met in that the *Newton* rule is specifically directed toward the insurance industry, requiring only that insurers notify participants of cancellations or modifications that adversely affect the participant's interests.

The question of preemption in these circumstances is a close one on which reasonable people can easily disagree. The objective factors set out by the Supreme Court in *Pilot Life* seem to weigh in favor of the plaintiff here. The court, however, is mindful of that court's instruction to treat ERISA's preemption provision as "deliberately expansive" and that ERISA remedies were intended to be exclusive. Furthermore, we are told that "we must not be guided by a single sentence, but look to the provisions of the whole law, and to its object and policy." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 51, 107 S.Ct. at 1555,

95 L.Ed.2d at 50. Also, there is a preference in favor of preemption. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 46, 107 S.Ct. at 1552, 95 L.Ed.2d at 47.

In the opinion of the court, the lower courts have been instructed by the Supreme Court that they are to find state laws within the "saving clause" in only the clearest of circumstances. Those circumstances are not present here. Accordingly, the court finds that the Alabama rule of *Newton* is preempted by ERISA, 29 U.S.C. § 1144(a), and is not saved from exemption by the "saving clause" of 29 U.S.C. § 1144(b)(2)(A).

## V. CONCLUSION.

In summary, the court finds that the defendant correctly interpreted the applicable provisions of the Benham health plan, had no duty under ERISA to notify the plaintiffs that Benham was delinquent, and had no duty to give the COBRA notice required by 29 U.S.C. § 1166(a)(4). Furthermore, the Alabama rule of *Newton v. United Chambers Insured Plans,* 485 So.2d 1147 (Ala.1986) is preempted by ERISA. Accordingly, judgment will be rendered for the defendant and against the plaintiff.